## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RUSSELL ALTMAN, | 3:07-cv-01383 (CSH) |
| Plaintiff, | **RULING ON DEFENDANT'S** |
| v. | **MOTION FOR SUMMARY** |
| | **JUDGMENT** |
| MOTION WATER SPORTS, Inc., | |
| Defendant. | July 12, 2010 |

HAIGHT, Senior District Judge:

The complaint in this diversity action alleges that on July 21, 2004 Plaintiff Russell Altman was water skiing on Candlewood Lake in Danbury, Connecticut. He fell. The binding on one of the skis failed to release Altman's left foot, causing him to suffer permanent physical injuries. Altman alleges that the ski was defective in several respects.

At some time prior to March 28, 2003, Altman purchased the skis from their manufacturer, Earth and Winter Sports, Inc. ("EOS"). On that date EOS and Defendant Motion Ocean Sports, Inc. ("MWS") entered into an agreement whereby MWS purchased the assets of EOS (the "Asset Purchase Agreement"). Altman sues MWS to recover for his injuries pursuant to the Connecticut Product Liability Act ("CPLA"), General Statutes §§ 52-572m *et seq.*, which provides the exclusive remedy for product liability.

MWS now moves for summary judgment on the threshold issue of successor liability under Connecticut law. The Court is asked to decide whether under Connecticut law MWS is liable to Altman for a defective product EOS manufactured and sold to Altman before MWS purchased EOS's assets.

# I

At the time of his injury, Plaintiff Altman was using "O'Brien" brand slalom "world team" water skis.  Defendant MWS neither made the skis nor sold them to Plaintiff Altman.  They were  manufactured and sold to Altman by EOS.  At the time EOS sold the skis to Plaintiff, MWS had not been incorporated and did not exist.  MWS was incorporated on March 28, 2003, the same day that MWS and EOS entered into an asset purchase agreement ("the Asset Purchase Agreement").  *See* Def.'s Mem. [Doc. #52-3] at 10.

Under the Asset Purchase Agreement, MWS did not acquire the stock of EOS.  Moreover, the Agreement explicitly provides that MWS did not assume any liabilities of EOS.  The Asset Purchase Agreement, a redacted copy of which was furnished to the Court following oral argument, provides in pertinent part:

> Section 2.3 Excluded Items
>
> The following rights, properties and assets (the "Excluded Items") are not included in the Assets, are excluded from sale and transfer hereunder and from the Foreclosure, and shall remain the property, responsibility, and sole liability of EOS after Closing. . . .
>
> (e) Liabilities not Expressly Assumed
>
> Any liabilities or obligations of EOS not specifically assumed by Buyer [MWS] under the terms of this Agreement or the Foreclosure, including but not limited to . . . products liabilities . . . .

After execution of the Asset Purchase Agreement, MWS continued to manufacture the same products as EOS under the same names, including the "O'Brien" line of water skis.  MWS took over the EOS factory in the state of Washington and continued employing Jeffrey Bannister, who held the positions of General Manager and Senior Vice President while at EOS.  Bannister was not a director of EOS.  MWS also hired about 50 former EOS employees, including about

21 who went to work on the O'Brien skis.  MWS further acknowledges in its main brief [Doc. 51] at 10 n.1 that "[t]he continued use of other assets owned by EOS and then the Defendant, such as intellectual property, machinery, and know-how, is also generally undisputed."  EOS was dissolved on June 1, 2005, by the state of Washington, the corporation's previous principal place of business.  There is and has been no continuity of stock, stockholders, and directors between EOS and MWS.

MWS moves for summary judgment on the ground that under a general common law rule relating to corporations, a purchaser of the assets of a corporate business is not liable for the debts and liabilities of the previous owner of those assets.  Altman, opposing the motion, first asserts that since this is a product liability case, the CPLA trumps general corporate law and renders MWS liable as a "product seller" of the offending water ski, as that phrase is used in § 52-572m(a) of the Act.  Secondly, Altman relies upon certain  exceptions to the common law rule against asset-purchaser liability.  MWS responds that it is not a "product seller" under the Act, and that the exceptions to the common law rule that Altman relies upon are either inapplicable on the facts or not recognized by Connecticut law.  In MWS's view, these are questions of law suitable for summary disposition.  In Altman's view, these issues involve disputed factual questions which preclude summary judgment and require further discovery.

## II

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2). [1]  "[T]he

---

1.      Absent contrary action by Congress, on December 1, 2010, this rule will revert to the language that existed prior to the 2007 "stylistic" amendments: "The court *shall* grant summary judgment if the movant shows that there is no genuine *dispute* as to any material fact and the

substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.  On a motion for summary judgment, "a court's responsibility is to assess whether there are any material factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Coach Leatherware Co. v. Ann Taylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991).  The moving party bears the burden of proving that no genuine issue of material fact exists, or that because of the paucity of the evidence presented by the non-moving party, no rational jury could find in its favor.  *Gallo v. Prudential Residential Servs.*, *L.P.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994).  While the moving party is not entitled to summary judgment if the evidence is sufficient to permit a reasonable jury to find for the non-moving party, the non-moving party must point to more than a scintilla of evidence in support of its claims to defeat summary judgment.  *See Havey v. Homebound Mortgage, Inc.*, 547 F.3d 158, 163 (2d Cir. 2008).  When the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment, *Jaramillo v. Weyerhauser Co.*, 536 F.3d 140, 145 (2d Cir. 2008), and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).

_____

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (proposed) (emphases added).

Since summary judgment motion practice under Rule 56 requires the trial judge to analyze the evidence available to both the moving and non-moving parties, pre-trial discovery usually precedes the motion.  However, in this case, the parties sought leave of the Court to file a limited motion for summary judgment on the threshold issues of liability under the CPLA and successor liability under corporate common law, *see* [Doc. #36] at 5, which leave was granted. *See* [Docs. ##44, 50].  Thus, the record in the case at bar has not been expanded by comparable discovery.  Defendant MWS moves for summary judgment on the basis of the pleadings, the Asset Purchase Agreement, responses to requests to admit, the Local Rule 56(a)(2) statements, and concessions in the briefs of counsel.  MWS contends that there is no basis under Connecticut law, statutory or common law, for imposing successor liability upon it in the circumstances of the case.  Altman, resisting summary judgment, argues that MWS is liable for the ski's defects and his injuries under the CPLA, or under recognized exceptions to the common law rule against successor liability for asset purchasers.

### III

Altman's first contention is that the CPLA directly imposes upon MWS the liability of a "product seller," as that term is used in the Act.  MWS responds that this construction flies in the face of the Act's plain language.

Section 52-572m of the CPLA is captioned "Product Liability Actions.  Definitions." Section 52-572m(a) provides:

> "Product seller" means any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption.  The term "product seller" also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products.

Section 52-572m(b) provides in part:

> "Product liability claim" includes all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product.

The remedy conferred by the Act is "in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."  Conn. Gen. Stat. § 52-572n.

Altman clearly states a "product liability claim" under § 52-572m(b) of the CPLA.  His theory is that the O'Brien slalom water ski he was wearing on July 21, 2004 "was defective and unreasonably dangerous in its design, in that the binding or the ski failed to release while being used as intended, and it proximately caused the injuries sustained by the plaintiff."  Amended Complaint [Doc. #42] ¶ 28.  MWS responds that it is not liable to Altman under the CPLA unless MWS may be characterized as a "product seller" of the *particular* offending "product" under § 52-572m(a).[2]

---

2.      It is worth noting that even if MWS is not the "product seller" of the product that injured Altman, that determination would not extinguish Altman's claims.  Rather, in that unlikely event, the underlying common law claims that are usually subsumed under the CPLA would instead resume their independent existence.  *See Burkert v. Petrol Plus of Naugatuck, Inc.*, 216 Conn. 65, 73, 579 A.2d 26 (1990) (where trademark licensor did not participate in the production, marketing or distribution of the allegedly defective product, it was plainly not the "product seller"; nevertheless, because the CPLA is only the "exclusive remedy for claims falling within its scope . . . the statute does not foreclose common law claims against those who are not product sellers").

There is force to MWS's argument.  But the statute's language sweeps broadly,[3] and it is not evident that MWS may avoid liability merely because it did not sell the particular ski that injured Altman.  The term "product seller" is drawn to include "any person or entity . . . who is engaged in the business of selling *such products*," a generalized plural, and a "product liability claim" is defined to include "all claims or actions brought for personal injury . . . caused by the . . . design . . . of *any product*."  Conn. Gen. Stat. § 52-572m(a)-(b) (emphases added).  The statute does not, on its face, require that the particular seller have sold the particular product that injured the particular claimant.  If such particularity must indeed be proven, it is because elements like proximate causation are now implicitly incorporated into the statutory "product liability claim," as elements of the torts that the statute replaced.  On its face, the statute requires only that the seller have "engaged in the business" of selling "such products."

It is generally undisputed, on this record, that MWS sold "such products" as the one that injured the plaintiff.  However, MWS neither manufactured the particular ski that caused the injury, nor sold it to Altman.  EOS performed those acts, before the injury occurred.  MWS admits that when it reopened the production facility formerly operated by EOS, "it began production to fill open orders for water skis that existed at the time MWS purchased the assets of EOS," that it "continued to manufacture the product line of O'Brien Water Skis formerly

---

3.  "It is well settled that in construing statutes, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. ... [W]e seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply."  *Sylvan R. Shemitz Designs, Inc. v. Newark Corp.*, 291 Conn. 224, 231 967 A.2d 1188 (2009) (internal quotation marks omitted; brackets and elipsis in original).  In a footnote, the Connecticut Supreme Court also reiterates that under Conn. Gen. Stat. § 1-2z, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

manufactured by EOS under the O'Brien Brand name," and that it "now enjoys the goodwill generated through the marketing and sales of O'Brien products . . . including O'Brien Water Skis manufactured and sold by EOS prior to March 2003." Def.'s Resps. to Pl.'s Reqs. for Admission [Doc. #55-5] ¶¶ 22, 25, 12. It is less clear whether MWS continued to sell "such products" containing the same alleged defect as the one that injured the plaintiff, but that is the kind of fact that would require additional discovery, and even with additional discovery, might present a genuine factual dispute for trial.

In other words, there is lingering uncertainty on the question of MWS's liability, and it results in large measure from the CPLA's silence about the liability of a successor product seller who acquires the assets of a predecessor product seller who had previously manufactured and sold the offending product to the injured consumer. Altman contends that the CPLA's definition of "product seller" is broad enough to include MWS — specifically because MWS falls under certain exceptions to the general rule against corporate liability for asset purchasers. So far as the briefs of counsel and the Court's research reveal, no Connecticut court has ever reached that conclusion. However, Altman relies by analogy upon the Connecticut Supreme Court's decision in *Lynn v. Haybuster Manufacturing, Inc.*, 226 Conn. 282, 627 A.2d 1288 (1993).

*Lynn v. Haybuster* illustrates how ambiguous terms in the CPLA should be construed, as well as how common-law claims that existed before the statute's passage fit into the statutory scheme.[4] In *Lynn*, the Connecticut Supreme Court determined that absent a contrary indication

---

4.     *Lynn* arose out of an injury suffered by plaintiff Dennis Lynn while demonstrating an industrial grinder manufactured by defendant Haybuster. Lynn sued Haybuster under the CPLA for his injuries. The complaint included a count on behalf of co-plaintiff Theresa Lynn, Dennis's spouse, for loss of consortium. The case was removed from Connecticut Superior Court to this Court. Defendant challenged the spouse's right to assert a loss of consortium claim under the CPLA. Judge Covello certified this question to the Connecticut Supreme Court: "[W]hether a loss of consortium claim by the spouse of an injured person is barred in an action brought

in the statute, the legislature would have wanted the statute to be interpreted in a way that was consistent with the common law as it existed *on the day the statute was passed* — including the most recent case law.  Thus, the Connecticut Supreme Court decided that the legislature must have intended for the term "damages" to be interpreted consistent with an opinion that the court had issued less than four months before the CPLA was passed in 1979.  "Because the legislature is presumed to know the state of the law when it enacts a statute, we can assume that, absent an affirmative statement to the contrary, it did not intend to change the existing law.  Accordingly, we conclude that a spouse asserting a derivative claim of loss of consortium falls within the general definition of 'claimant' in the act."  *Id.* at 291-92 (ellipses, internal quotation marks, and citations omitted).

Employing such logic here, the General Assembly must have known the common law rule in this country: corporations that purchase assets do not automatically inherit the liabilities of the corporation that sold the assets.  Likewise, we may charge the legislature with constructive knowledge of the established exceptions to that rule, which are discussed at greater length *infra*.[5]

---

pursuant to the Product Liability Act."  226 Conn. at 284 n.1.

The Connecticut Supreme Court's answer was that the act does not bar common law loss-of-consortium claims by the spouse of an injured person.  The Court first determined that "[t]he claim by a wife for loss of consortium . . . is now firmly rooted in our common law," and that "[i]nterpreting a statute to impair an existing interest or to change radically existing law is appropriate only if the language of the legislature plainly and unambiguously reflects such an intent."  *Id.* at 287, 289.  The other side of that coin is that "if a statute creates a cause of action that did not exist at common law, such that it is the exclusive means by which damages from a particular injury are recoverable, they are recoverable only to the extent that  they have been specifically articulated."  *Id.* at 296 (citation and footnote omitted).  Because claims for loss of consortium existed before passage of the CPLA, and indeed before the passage of the Connecticut Constitution, they could not be extinguished by the legislature without a plain and ambiguous reflection of that intent.  *Id.* at 288.

5.      *See, e.g.*, *Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834, 838 (S.D.N.Y. 1977) ("A corporation that purchases the assets of another company is not liable for the liabilities of its predecessor absent a showing that 1) it expressly or impliedly agreed to assume the

Thus, it is safe to assume that the term "product seller," as defined in the CPLA, takes the good with the bad.  There is no indication that the legislature intended to create products liability for a good-faith purchaser of assets where no such liability had existed previously.  Likewise, the legislature did not manifest any intent to permit a company purchasing another's assets to escape products liability if, prior to the act's passage, other factors would have triggered the common law exceptions and caused liability to run with the assets.  Indeed, it would be a strange result — and one entirely inconsistent with the rest of the statutory scheme — if certain business liabilities survived the change in corporate owners under established exceptions to the common law of corporations, but injured consumers alone were left without a remedy.

## IV

In *Ricciardello v. J.W. Gant & Co.*, 717 F. Supp 56 (D.Conn. 1989), an action under federal and Connecticut statutes against a successor brokerage firm for its predecessor's securities violations, Judge Dorsey undertook to state the general common law rule against successor corporate liability:

---

liabilities; 2) there was a merger or consolidation of the two firms, or 3) the buyer is a 'mere continuation' of the seller."); *Pierce v. Riverside Mortg. Securities Co.*, 25 Cal. App. 2d 248, 257-258, 77 P.2d 226, 231 (1938) ("It is well settled that: 'If the stockholders of a corporation organize another corporation, and transfer all of the assets of the former to the latter, without paying the debts of the former, the transfer, irrespective of the actual intention of the parties, constitutes a fraud on the creditors of the old corporation, and the new corporation is liable in equity for the debts of the old to the extent of the assets received by it.'  Such transfer is not, however, necessarily fraudulent where the grantor retains substantial assets or where a full and adequate consideration is paid by the transferee." (citations omitted)); *Hibernia Ins. Co. v. St. Louis & N.O. Transp. Co.*, 13 F. 516, 518 (C.C.E.D. Mo. 1882) ("Upon these facts this court holds that the sale by the Babbage Company of all its property to another corporation, composed mostly, if not wholly, of the same persons, was fraudulent and void as to all creditors of the former company not assenting thereto. The purchaser knew that it was buying all the property of the seller, and that, by the transaction, the latter was being deprived of the means and power of meeting any of its outstanding obligations. The fair inference from the transaction is that the old company was about to be dissolved, and to cease to be. It was to be absorbed by the new company.").

-10-

> Under the general rule, a corporation which purchases all the assets of another company does not become liable for the debts and liabilities of its predecessor unless (1) the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms; (3) the purchaser is a "mere continuation" of the seller; or (4) the transaction was entered into fraudulently for the purpose of escaping liability.

*Id.* at 57-68.   Judge Dorsey did not refer to any Connecticut cases for the general rule he articulated in *Ricciardello*.  Instead, he cited a District of Colorado case which had in turn cited a treatise, Fletcher, *Cyclopedia of the Law of Corporations*, and a Southern District of New York case.  717 F. Supp 57 at n.2.

In 2006 the Appellate Court of Connecticut decided *Chamlink Corp. v. Merritt Extruder Corp.*, 96 Conn. App. 183 (2006), an action to recover an unpaid corporate debt, where the trial court held that there was no successor liability between the defendant corporation and its predecessor.  The Appellate Court began its analysis by saying:

> The mere transfer of the assets of one corporation to another corporation or individual generally does not make the latter liable for debts or liabilities of the first corporation except where the purchaser expressly or impliedly agrees to assume the obligations, the purchaser is merely a continuation of the selling corporation, [the companies merged] or the transaction is entered into fraudulently to escape liability.

*Id.* at 187 (citations and internal quotation marks omitted) (brackets in original).  Since the Appellate Court echoed the principles Judge Dorsey articulated in *Ricciardello,* they may now be regarded as established principles of Connecticut common law.

In *Chamlink* the Appellate Court went on to say:

> There are two theories used to determine whether the purchaser is merely a continuation of the selling corporation. "Under the common law mere continuation theory, successor

> liability attaches when the plaintiff demonstrates the existence of a
> single corporation after the transfer of assets, with an identity of
> stock, stockholders, and directors between the successor and
> predecessor corporations." *Graham v. James*, 144 F.3d 229, 240
> (2d Cir. 1998). Under the "continuity of enterprise" theory, a mere
> continuation exists "if the successor maintains the same business,
> with the same employees doing the same jobs, under the same
> supervisors, working conditions, and production processes, and
> produces the same products for the same customers." *B.F.
> Goodrich v. Betoski*, 99 F.3d 505, 519 (2d Cir. 1996).

96 Conn. App. at 187.

*Chamlink* cannot be read to establish both theories as part of Connecticut law, because

the Appellate Court held that "[a]pplying either theory to the evidence on the record, it is clear

that the court's determination that Merritt Extruder Connecticut is not a mere continuation of

Merritt Davis was not clearly erroneous," and added in a footnote: "Because it is clear under

both theories that Merritt Extruder Connecticut is not a mere continuation of Merritt Davis, *we

need not adopt one theory over the other at this time*." *Id.* at 187-188, 188 n.3 (emphasis added).

However, it is instructive in the case at bar to consider the *Chamlink* court's evaluation of the

evidence:

> The court made the following factual findings relating to the
> common-law mere continuation theory. Merritt Davis had nine
> shareholders, including Guthrie, who owned 17 percent of the
> company. Merritt Extruder Connecticut has only one shareholder,
> Guthrie. Merritt Davis had ten board members, including Guthrie.
> Guthrie is Merritt Extruder Connecticut's only board member. The
> court made the following factual findings relating to the continuity
> of enterprise theory. Merritt Extruder Connecticut uses the same
> telephone number that Merritt Davis used. Merritt Extruder
> Connecticut occupies one half of the same office space that Merritt
> Davis once occupied. Merritt Extruder has fourteen employees,
> while Merritt Davis had thirty-five at the time it was forced to
> dissolve. Merritt Extruder Connecticut has a narrower product line
> than Merritt Davis had. Merritt Extruder Connecticut purchased
> only physical assets from Merritt Davis and did not purchase any
> contract rights or accounts receivable. Merritt Davis's assets were

-12-

> purchased with Guthrie's personal funds. After reviewing the court's factual findings and the applicable principles of law, we conclude that the court's determination that Merritt Extruder Connecticut was not a mere continuation of Merritt Davis was not clearly erroneous.

96 Conn. App. at 188-89.

The Connecticut Appellate Court quoted and expanded upon the *Chamlink* decision in *Kendall v. Amster*, 108 Conn. App. 319 (2008). The case arose on an application under Connecticut law by plaintiff judgment creditor for a prejudgment remedy in aid of enforcing a Massachusetts judgment against an individual, Bruce Amster, and a corporation, Hyannis Restorations. Following the judgment, Bruce Amster had subsequently moved to Connecticut and worked for a new corporation called Red Line, which was incorporated by his son.[6] The trial court issued a prejudgment remedy attaching assets of Red Line and Colton Amster, son of Bruce Amster. After conducting a hearing, the trial court "then made a specific finding regarding Red Line, concluding that it was 'a continuation of the business that Bruce Amster conducted through Hyannis Restorations . . . and [that] Bruce Amster has worked at Red Line approximately five to six hours a day.'" 108 Conn. App. at 331. The Appellate Court affirmed, stating:

> The court found that Red Line was a continuation of Hyannis Restorations controlled by Bruce Amster. Red Line was in the same business, restoring rare, expensive vintage automobiles; used the same personnel, namely, Bruce Amster and Colton Amster; and had the same customers. "*The mere transfer of the assets of one corporation to another corporation or individual generally does not make the latter liable for the debts or liabilities of the first corporation except where* the purchaser

---

6. Bruce Amster had a habit of keeping things in the family. Before he moved to Connecticut, Bruce Amster had also fraudulently "set up a 'straw corporation,' Hyannisport Restorations, to which Bruce Amster had transferred the assets and good will of Hyannis Restorations . . . . The 'straw man' of Hyannisport Restorations was Bruce Amster's father." 108 Conn. App. at 323 & n.5. Before Bruce Amster moved to Connecticut, the Massachusetts court had already found him in contempt for that conduct. *Id.* at 323.

> expressly or impliedly agrees to assume the obligations, *the purchaser is merely a continuation of the selling corporation . . . or the transaction is entered into fraudulently to escape liability*. . . . Under the continuity of enterprise theory, [successor liability attaches where] the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers." (Citations omitted; emphasis added; internal quotation marks omitted.) *Chamlink Corp. v. Merritt Extruder Corp.*, 96 Conn.App. 183, 187-88, 899 A.2d 90 (2006).

*Id*. at 332 (emphases, ellipses, and bracketed modifications in *Kendall*). The Appellate Court's omissions in the quotation above deserve special attention: in *Kendall*, the Appellate Court chose to ignore completely the so-called "common law mere continuation theory," which requires an overlap in ownership, and instead focused exclusively on the continuity-of-enterprise theory of mere continuation, which does not require any overlap.[7]

In *Kendall* the Appellate Court makes it plain that "continuity of enterprise" is not just a theory of successor liability, it is a recognized principle of Connecticut law.[8] There is no other way to read the opinion. The trial court based its prejudgment remedy against Red Line on the conclusion that Red Line was a continuation Bruce Amster's business, despite a difference in ownership: Bruce Amster had been the "owner" of the original Massachusetts debtor company, while Red Line was incorporated by his son Colton. *See* 108 Conn. App. at 321 n.3, 324. The

---

7.      If one interprets the Appellate Court's emphases in *Kendall* when quoting *Chamlink*, the the *Kendall* court also seems to be invoking the fraud exception to successor liability. However, the trial court in *Kendall* explicitly rested its holding on the finding that Red Line was "a continuation of the business that Bruce Amster conducted through Hyannis Restorations," 108 Conn. App. at 331 (quoting the trial court), and the Appellate court affirmed "[o]n the basis of [that] finding," and nothing else. *Id.* at 332.

8.      Indeed, it must be said that the continuity-of-enterprise exception to successor liability is now incorporated into Connecticut's "common law," despite the fact that the Appellate Court in *Chamlink* originally contrasted the continuity-of-enterprise mere-continuation theory *against* what it called the "common law mere continuation theory." *Chamlink*, 96 Conn. App. at 188.

-14-

Appellate Court affirmed: "On the basis of the finding that Red Line was nothing more than a continuation of Hyannis Restorations, and thus subject to successor liability, we cannot say that it was clear error for the court to order a prejudgment remedy . . . ." *Id.* at 332. Applying the Connecticut Supreme Court's analysis in *Lynn*, it follows that a products liability plaintiff such as Altman, suing under the CPLA, may invoke the continuity-of-enterprise theory of the mere continuation exception to the general rule against asset-purchaser liability, because the theory and the exception have been recognized by the Connecticut Appellate Court as part of Connecticut common law.[9]

## V

## A

Insofar as Altman relies upon the so-called "common law" theory of the mere-continuation exception to the rule against successor liability, MWS is entitled to summary judgment. The undisputed facts that there was no transfer of corporate stock from EOS to MWS and a total lack of continuity of shareholders and directors are fatal to Altman's invocation of this exception. Contrary to Plaintiff's contention, no conceivable discovery could revive it.

*Chamlink* makes clear that in Connecticut, "[u]nder the common law mere continuation theory, successor liability attaches where the plaintiff demonstrates the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors . . . ." 96 Conn. App. at 188. That explains why this particular version of the "mere continuation" exception enumerated in *Ricciardello* is often considered interchangeable with the

---

9.     I reject MWS's assertion that Altman cannot rely upon the continuity-of-enterprise exception because it was not pleaded in the amended complaint and was first asserted in Plaintiff's brief on this motion. Read fairly, the amended complaint includes a continuity-of-enterprise theory of successor liability.

second exception, "a merger or consolidation of the two firms."  *See Greystone Comm. Reinv. Assoc., Inc. v. Berean Capital, Inc.*, 638 F. Supp. 2d 278, 291 (D. Conn. 2009) (Droney, J.) ("Thus the [identity of owners] test for the 'mere continuation' exception in Connecticut and Illinois is materially the same, and in both states a 'mere continuation' analysis is similar to and overlaps with the *de facto* merger analysis."); *Kuhns Bros., Inc. v. Fushi Int'l, Inc.*, No. 3:06-cv-1917, 2008 WL 2167091 (D. Conn. May 21, 2008) (Dorsey, J.), at *5 ("For the purposes of determining successor liability, analysis of a 'mere continuation' and a 'de facto merger' may be treated together.") (citations and internal quotation marks omitted).  In *Chamlink*, 96 Conn. App. at 188-89, there was at least some identity of board members, but the Appellate Court concluded that it was insufficient to establish the mere continuation exception.  On that point, *Chamlink* controls the case at bar *a fortiori*.

## B

A different conclusion must be reached with respect to Altman's invocation of the continuity-of-enterprise theory of the mere-continuation exception.  This theory of the exception applies where "the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers."  *Kendall*, 108 Conn. App at 332 (citing and quoting *Chamlink*).  The answers to requests for admission and interrogatories, read together with certain acknowledgments in the briefs of counsel, demonstrate some of these elements, to a sufficient degree to preclude summary disposition.  But the present record is skin deep.  Plaintiff is entitled to full discovery on the applicability of the continuity-of-enterprise theory to his claim against MWS.

**C**

Altman also relies upon the "product line" exception to the rule against successor liability. Unlike the mere-continuation exception, which is widely accepted, no Connecticut appellate court appears to have considered the product-line exception. A number of state Superior Court judges have done so, as have judges of this Court, construing Connecticut law. I will consider some of those cases in chronological order, beginning with the earliest one.

In *Pesce v. Overhead Door Corp.*, No. 2:91-cv-435, 1998 WL 34347073 (D. Conn. Aug. 17, 1998), Judge Hall had occasion to consider the product line exception in a case which turned indirectly upon Connecticut products liability law. I say "indirectly" because *Pesce* was a "common law indemnification action." *Id.* at *1. An individual sustained injuries when the door of a hangar at plaintiff Pesce's airport collapsed on him. Pesce settled the claim and sued defendant Overhead Door for indemnification. The door had been designed, manufactured, and installed by a company called Closures, Inc. Prior to the accident, Overhead Door acquired the assets of Closures. Overhead Door moved for summary judgment, invoking the general rule against successor liability. Pesce opposed summary judgment, relying upon the "mere continuation" and de facto merger exemptions contained in the general rule as traditionally stated. Pesce "also insisted that the defendant be held liable as a successor corporation under two nontraditional exceptions to the general rule: the product line exception and the duty to warn doctrine." 1998 WL 34347073, at *2.

Judge Hall rejected all the plaintiff's efforts to avoid the general rule, including the product line exception, and granted defendant's motion for summary judgment, holding that "[p]laintiff has created no genuine issue of material fact that the defendant Overhead Door, as a

successor corporation, is legally liable for the alleged negligence of its predecessor, Closures Inc." *Id.* at *5.[10]  As for the product line exception, Judge Hall observed that it was "established by the California Supreme Court in *Ray v. Alad Corp.*, 19 Cal. 3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977)" and "imposes liability on a successor corporation for defects in products that a predecessor manufactured if the asset purchaser continues to manufacture the same product." *Pesce*, 1998 WL 34347043, at *3.  That profile fits MWS, since as noted *supra* MWS does not dispute that after acquiring EOS's assets in March 2003, it manufactured O'Brien-brand water skis and continued to sell them to the public.  Moreover, "[u]nder the product line exception, an asset purchaser does not have to acquire an entire business for a court to impose liability as a successor corporation."  *Pesce*, 1998 WL 34347043, at *3, a circumstance that also applies to MWS.

Notwithstanding these factors, Judge Hall declined to give the plaintiff the benefit of the product line exception.  She noted that "[t]he overwhelming majority of state courts have expressly declined to endorse this theory of liability.  The supreme courts of only three states have adopted it: California, Washington, and New Jersey.  Federal courts have also expressed reservations that the product line exception would be adopted by several state courts."  1998 WL 34347073, at *3 (footnotes with comprehensive collections of cases omitted).  Judge Hall concluded:

> The court declines to join the small minority of courts that have recognized the product line exception.  The court has not identified a single Connecticut court that has recognized the doctrine.

---

10.      Judge Hall's reference to the "alleged negligence" of Closures reflects the fact that plaintiff's asserted duty to warn exception to the general rule against successor liability "is actually based on negligence," 1998 WL 34347073, at *4.  However, the general rule applies equally to product liability claims. Altman, the plaintiff at bar, does not contend otherwise.  He opposes defendant MWS's motion for summary judgment by invoking exceptions to the rule.

-18-

> Moreover, it would impose drastic changes to the principles of
> state corporate law, changes best reserved for the state legislature.

*Id*.

There is a distinctly odd aspect to the *Pesce* litigation.   Either Judge Hall or Judge Arterton, her predecessor in the case, certified to the Connecticut Supreme Court one of the precise questions presented in this case: whether Connecticut law recognizes "the 'product line' exception to the general rule against successor liability for predecessor product defects?"  1998 WL 34347073, at *2 n.3.  It would appear that the Connecticut Supreme Court initially accepted the certification, but then, "reversing its decision accepting the certification, simply referred to its *Skuzinski* decision."  *Id.* at  *2.  That delphic reference to *Skuzinski v. Bouchard Fuels, Inc.*, 240 Conn. 694, 694 A.2d 788 (1997), rendered the Court's response in *Pesce* entirely useless, since as Judge Hall observed, "the *Skuzinski* Court did not grapple with the legal duties — in the context of an indemnification action or any other negligence-based action — that extend to a successor corporation as a result of the conduct of its predecessor," and consequently "*Skuzinski* did not answer the particular questions posed by this court in the certification," 1998 WL 34347073, at *2.  Left to her own devices, and *faute de mieux*, Judge Hall decided the question herself and held that Connecticut law did not recognize the product line exception.

In 2005, a Connecticut Superior Court, dealing with a preliminary phase of the *Chamlink* litigation, recited the *Ricciardello* exceptions to the rule against successor liability, and then said:

> In addition to the above, there is an additional *recognized
> exception* — the so-called 'product line continuation' exception.
> This   exception applies where the transferee corporation (1)
> acquires substantially all of the transferor's assets; (2) holds itself
> out as a continuation of the transferor by producing the same
> product line; and (3) benefits from the goodwill of the transferor.

*Chamlink v. Merritt Extruder*, No. CV044000037, 2005 WL 1097311, at *2 (Conn. Super. Ct. April 11, 2005) (emphasis added).  For the proposition that the product line continuation was an "exception," the court cited only a New Jersey case, but went on to say that "[a]s the defendant correctly points out, however, this exception has only been applied to strict liability cases," citing a Connecticut case, *Sullivan v. A.W. Flint Co.*, No. CV920339263, 17 Conn. L. Rptr. 331, 1996 WL 469716 (Super. Ct. Aug. 5, 1996), as well as a California case and a New Jersey case.

In 2006, Judge Droney held in *Collins v. Olin Corp.*, 434 F. Supp. 2d 97 (D. Conn. 2006), that the defendant corporation was not subject to successor liability under CERCLA for its predecessor's environmental contamination.  The plaintiff homeowners invoked the product line exception to the general rule against successor liability.  Judge Droney declined to apply it.  He reasoned:

> While a number of Connecticut Superior Courts have applied the exception, it has not been endorsed by the Connecticut Appellate or Supreme Courts.  Finally, the Connecticut Superior Courts that have applied the product-line exception have only done so in cases of strict products liability for personal injury.

*Id*. at 106 (citations omitted).  *Sullivan* was one of the Connecticut cases Judge Droney cited, and he went on to say of that decision:

> In *Sullivan*, the Court explained that the product-line exception would be used only to preserve the principles of strict products liability.  "[T]he product line exception should be viewed not as some radical expansion of the strict liability rule but as a way of preserving the goals sought to be achieved by the imposition of strict liability in the first place."  *Sullivan*, 17 Conn. L. Rptr. at 21-22.  Unlike *Sullivan* and the other Superior Court decisions cited, this case does not involve strict products liability for personal injuries arising from defective goods.  Therefore, the underlying policy reasons to apply the product-line exception are not implicated here.

*Id.* at 107.  Judge Droney then quoted Judge Hall's words in *Pesce* ("join[ing] the small minority of courts that have recognized the product line exception . . . would impose drastic changes to the principles of state corporate law, changes best reserved for the state legislature"), and concluded; "The Court agrees with Judge Hall, and similarly declines to apply the product-line exception in this case."  *Id.*

In 2008, in *Albini v. Osteoimplant Technology, Inc.*, No. CV075006110S, 46 Conn. L. Rptr. 513, 2008 WL 4925967 (Super. Ct. Oct. 20, 2008), a Superior Court rejected the product line exception in a products liability action arising out of the failure of an artificial hip.  The hip had been manufactured by a company known by its initials of OTI.  In February 2005, Encore, a competitor of OTI, entered into an asset purchase agreement with OTI to acquire substantially all the assets of OTI.  The agreement specifically provided that Encore was purchasing only the assets of OTI, and not the liabilities.  The transaction was an arm's length transaction in all respects.  Encore had no connection with OTI.  It did not, prior to February 2005, manufacture, sell or distribute the type of OTI artificial hip at issue.  After Encore purchased the assets of OTI in 2005, it pulled all of the inventory of OTI's artificial hip off the market.  Two years after his original surgery, the plaintiff alleges he had an acute onset of hip pain, that it was discovered that his OTI artificial hip had shattered and he had to undergo a second hip replacement.  2008 WL 4925967, at *1.  Plaintiff sued both OTI and Encore.  The court, in granting Encore's motion for summary judgment, refused to apply the product line exception:

> This court has considered carefully those few cases decided by its colleagues, in the 1990s, wherein the fifth exception [product line] was adopted.  However, absent controlling authority in this state, this court declines to adopt what is clearly a minority position. . . . Though trial court decisions can serve as persuasive authority for other trial courts, one trial court in Connecticut

cannot bind another when the issue has yet to be determined by the
Connecticut Appellate or Supreme Court or the United States
Supreme Court.

2008 WL 4925967, at *3 (citation and internal quotation marks omitted). The *Albini* court went
on to note that "the Connecticut federal district court decisions applying Connecticut law have
consistently declined to adopt a fifth exception, absent directive ruling from a Connecticut
appellate court." *Id*.

In 2009, in *Beriguette v. Innovative Waste Systems, Inc.*, No. CV054006895, 48 Conn. L.
Rptr. 236, 2009 WL 2450773 (Super. Ct. July 7, 2009), an action for wrongful discharge from
employment by a predecessor corporation, a Superior Court noted that plaintiff relied upon
certain of the traditional exceptions to the rule against successor liability, and added in a
footnote: "The third ground for the application of the doctrine of successor liability in the
amended complaint refers to the 'product line continuation' exception to the general rule against
successor liability *that has been recognized by the Superior Court*." 2009 WL 2450773, at *1
n.2 (citing *Chamlink*, 2005 WL 1097311) (emphasis added). The court did not pursue that
subject further, and decided the case on other grounds.

What is this Court to make of the product line exception in this case? While it may have
been difficult in 1998, when *Pesce* was decided, to identify "a single Connecticut court that has
recognized the doctrine," that is true no longer. Although they are not unanimous (the *Albini*
court having refused recognition), a number of Superior Courts have allowed the exception in the
area of strict products liability for personal injury. It appears to remain the case that no *appellate*
Connecticut court has considered the question. But I do not think that circumstance requires this
Court to defer its decision in this case until a state appellate court addresses the question in a

-22-

different one, or until the Connecticut legislature amends the CPLA (if it ever does); and, as *Pesce* indicates, it is not always profitable to ask the Connecticut Supreme Court for instruction.

Altman alleges that he presently suffers from a serious injury.  MWS is confronted with a significant potential liability.  The Court's obligation is to use its best efforts to determine the rights and obligations of the parties *in this case.  See Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000) ("When there is an absence of state authority on an issue presented to a federal court sitting in diversity, as has occurred here, the federal court must make an estimate of what the state's highest court would rule to be its law.").

The strongest argument for the courts' deferring to the legislature, urged by MWS in the case at bar, is that articulated by Judge Hall in *Pesce*: judicial recognition of the product line exception "would impose drastic changes to the principles of state corporate law, changes best left for the state legislature."  Certainly there are competing policy considerations.  When a defective product injures a consumer, both the consumer and an asset-purchasing successor corporation are "innocent" parties, in the sense that neither is responsible for the defect.  The question is who should bear the burdens of the consumer's injury.  The Connecticut Superior Court in *Sullivan* viewed the product line exception in strict liability cases favorably, "as a way of preserving the goals sought to be achieved by the imposition of strict liability in the first place," while recognizing the risk that "the imposition of strict products liability on corporations that purchase manufacturing assets will have a chilling — even a crippling — effect on the ability of the small manufacturer to transfer ownership of its assets for a fair purchase price rather than be forced into liquidation proceedings," since "[b]usiness planners for prospective

purchasing corporations will be hesitant to acquire a potential can of worms that will open with untold contingent product liability claims." 1996 WL 469716, at *3.

However, courts traditionally resolve such policy issues, particularly where as in this case they arise out of interstices in a statute. On the facts of this case, application of the product line exception is more consistent with the consumer-protection goals of the CPLA.

The Superior Court's decision in *Albini*, when analyzed, does not counsel strongly against that conclusion. The successor corporation, having purchased the assets of its predecessor, "pulled all of the inventory of [the predecessor's] artificial hip and stopped selling it." No wonder that the court declined to apply the product line exception to the successor corporation and impose liability for a defective joint made and sold to the consumer by the predecessor. *Albini* can be read as not rejecting the product line exception in principle, but refusing to apply it in practice in the circumstances of the case. The case at bar is quite different. MWS continued the manufacture and sale of the same O'Brien-brand water skis, using for that purpose EOS's former plant and a significant number of EOS's former employees.

I conclude that Altman is also entitled to invoke the product line exception to the general rule against successor liability, and MWS is not entitled to a summary disposition of the issue. As with the mere-continuation exception, there must be full discovery.

## VI

For the foregoing reasons, the motion of Defendant Motion Water Sports, Inc. for summary judgment is DENIED. This denial of summary judgment is without prejudice to the right of either party to move for summary judgment after the completion of discovery consistent with this Ruling.

Counsel for the parties are directed to confer and to submit not later than July 30, 2010 a revised plan under Rule 26(f), Fed. R. Civ. P.

It is SO ORDERED.

Dated: New Haven, Connecticut
       July 12, 2010

_____/s/ Charles S. Haight, Jr._____
Charles S. Haight, Jr.
Senior United States District Judge